UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

MICHAEL NORMAN PITTMAN                    CIVIL ACTION

VERSUS                                     NO: 07-3790

STANDARD INSURANCE CO., ET                 SECTION: "A" (1)
AL.

## ORDER AND REASONS

Before the Court are cross **Motions for Summary Judgment**
**(Rec. Docs. 74 & 75)** filed by defendant The Paul Revere Life
Insurance Co. ("Defendant" or "Paul Revere") and plaintiff,
Michael Norman Pittman, M.D. ("Plaintiff" or "Dr. Pittman").  At
a status conference held on July 21, 2008 (Rec. Doc. 46), the
parties agreed that the merits of the case could most likely be
resolved via cross motions for summary judgment.  The motions,
set for hearing on December 10, 2008, are before the Court on the
briefs without oral argument.

For the reasons that follow, the Court is persuaded that
Plaintiff is due total disability payments under his policy with
Defendant.  Accordingly, Plaintiff's motion for summary judgment
is GRANTED IN PART AND DENIED IN PART and Defendant's motion for
summary judgment is DENIED.

I.   BACKGROUND

This is a dispute over disability insurance payments.  In
1994, Dr. Pittman purchased and Paul Revere issued a professional

disability income policy.  On the application Dr. Pittman stated that his occupation was a "urologist" and that his exact duties were "the practice of urology."  (Pla. Exh. A, Policy w/ App.).  The policy provides *inter alia* for a maximum monthly benefit of $11,250.00 for life in the event of "Total Disability."  The policy also has a maximum monthly benefit for "Residual Disability" which is payable until Dr. Pittman reaches 65 years of age.  (Pla. MFND ¶¶ 2 & 3).  Dr. Pittman is currently 56 years old.  The annual premium for the disability coverage is $7,531.80.  (Pla. MFND ¶ 9).

On March 27, 2006, Dr. Pittman notified Paul Revere that he had become disabled due to a back injury attributable to a motor vehicle collision which occurred on November 25, 2005.  (Pla. MFND ¶ 11).  Paul Revere received Dr. Pittman's initial claim forms on or around May 22, 2006.  (Pla. Exh. D, Stimson 4-30-07 Corresp.).  Paul Revere accepted liability for Dr. Pittman's claim under the monthly benefit for "Total Disability" using December 5, 2005, as the initial date of disability.  (Id.; Pla. MFND ¶ 13).  Following a 90 day elimination period, Paul Revere began paying benefits effective March 5, 2006.  (Pla. MFND ¶ 13).

The record shows that on May 26, 2006, Scott Gillaspie, a Disability Benefits Specialist with Paul Revere, interviewed Dr. Pittman by phone regarding his claim.  (Pla. Exh. N).  On June 6,

2006, Gillaspie wrote to Dr. Pittman and requested additional information to help in determining whether the claim would be most appropriately considered as one of Total Disability or Residual Disability. (Def. Exh. 7). Paul Revere sent Charles McGinty to conduct an interview with Dr. Pittman at his home. (Def. Exh. 8 & 9). As of the date of McGinty's report on July 10, 2006, Dr. Pittman explained that his post-disability duties involved only seeing patients at the clinic and that he was no longer able to perform surgery because he could not stand for longer than 15 minutes. (Pla. Exh. J). The report also noted Dr. Pittman's numerous other business investments. In particular, he is 100 percent owner of Medical Center Diagnostics, LLC, an imaging center located adjacent to his office. (Id.). According to McGinty, Dr. Pittman explained that he has had to focus more on his business ventures as a result of his limitations regarding medicine. He used to handle his business between patients but now has more time. (Id.). He is constantly on the phone conducting business. (Id.). Dr. Pittman receives no income from Medical Center Diagnostics because all profits are put back into the business.

on January 18, 2007, Paul Revere advised Dr. Pittman in writing that the Supplemental Social Insurance Rider portion of his policy would provide an additional benefit but that he would

be required to apply for disability Social Security benefits. (Pla. Exh. F). In February 2007, Dr. Pittman closed his urology practice completely and has not practiced urology or any form of medicine since that date. (Pla. Exh. B ¶ 5). The Social Security Administration scheduled an IME with Dr. Paul Doty, an orthopedist, who issued his report on May 27, 2007. (Pla. Exh. H). Dr. Doty concluded that Dr. Pittman suffered from "marked degenerative disc disease" and that he would continue with back distress for the remainder of his life. (Id.). Dr. Doty also opined that Dr. Pittman's back distress would limit his ability to perform surgeries in light of the chronic pain that he suffered. (Id.). In June 2007, the Social Security Administration found that Dr. Pittman met the criteria for total disability benefits. (Pla. Exh. G.).

On April 23, 2007, Paul Revere's Lead Disability Benefits Specialist Adam Stimson was convinced that prior to his claim Dr. Pittman had been working as both a urologic surgeon as well as the owner of the imaging center, Medical Center Diagnostics, LLC. (Def. Exh. 24). Stimson was persuaded that Dr. Pittman was continuing to perform the duties of a urologic surgeon in a reduced capacity and that he was continuing to own and operate Medical Center Diagnostics, LLC in an increased capacity. (Def. Exh. 24). Thus, Stimson concluded that Dr. Pittman's claim was

most appropriately classified as one under the policy's Residual Disability section as opposed to the policy's Total Disability section. (Id.). Stimson also noted that the prior monthly income calculations under the policy's Residual Disability section produced a negative number due to the significant losses experienced by Medical Center Diagnostics, LLC, and given the fact that Dr. Pittman had deducted these losses on his federal tax return in order to offset his income. (Def. Exh. 25). Stimson concluded that all benefits should be terminated because Dr. Pittman's continuing work duties did not allow him to meet the definition of Total Disability, and because he did not sustain the requisite 20 percent loss of income in light of his negative earnings. (Id.). On that same day, Paul Revere began video surveillance of Dr. Pittman's home and office. (Pla. Exh. E.). The surveillance revealed nothing noteworthy.

On April 30, 2007, Stimson wrote to Dr. Pittman and informed him that he was no longer eligible for benefits. (Def. Exh. 26). Stimson explained that Paul Revere had conducted an updated review of Dr. Pittman's occupational duties both prior to and during his claim for disability. Paul Revere was persuaded that Dr. Pittman was continuing to perform some of the occupational duties of a urologic surgeon, notably seeing patients, performing consultations, ordering laboratory tests, and administering

medications. (Def. Exh. 26). Noting that Dr. Pittman's insurance billings were less than 40 percent of his pre-disability charges, Paul Revere nonetheless had concluded that Dr. Pittman continued to perform some of the "important duties" of a urologic surgeon. (Id.). Further, the letter explained that it appeared that Dr. Pittman had been performing occupational duties as the owner of Medical Center Diagnostics, LLC at the same time he had been working as a urologic surgeon prior to the initial date of disability. (Id.). Thus, Dr. Pittman's claim was most appropriately handled under the Residual Disability provision of the policy. (Id.).

The letter went on to explain that Paul Revere had calculated Dr. Pittman's prior earnings as required by the Residual Disability section of the policy but that the calculations yielded a negative number in light of the substantial losses sustained by Medical Center Diagnostics each year. (Id.). Given that Dr. Pittman's prior earnings were negative, he would never be able to satisfy the loss of earnings as required by the policy. (Id.). Thus, Paul Revere concluded that Dr. Pittman was no longer eligible for benefits. (Id.).

Dr. Pittman filed suit in state court seeking to recover past due disability payments and seeking a judgment ordering Paul Revere to reinstate his benefits. Dr. Pittman also seeks

penalties and attorney's fees pursuant to La. R.S. §§ 22:658[1] and 22:1220. The case was removed to this Court and on September 8, 2008, Plaintiff filed a Second Supplemental and Amended Complaint (Rec. Doc. 57) in which he adds an allegation of anticipatory breach seeking that all benefits become due and owing in full at this time. At a status conference held on July 21, 2008 (Rec. Doc. 46), the parties agreed that the merits of the case could most likely be resolved via cross motions for summary judgment.

## II. DISCUSSION

### *The Parties' Arguments–Plaintiff*

Plaintiff directs the Court's attention to the original application that he submitted when applying for disability coverage where he listed his occupation as a "urologist" with his exact duties being the "practice of urology." (Pla. Exh. A). Plaintiff points out that the policy contains an Incontestable clause that prevents Paul Revere from contesting any statements in the application once the policy has been in effect for two years. Thus, the only occupation that Paul Revere could consider when deciding whether or not to honor Dr. Pittman's claim was urology. Plaintiff argues that the clear intent when purchasing

---

[1] Plaintiff's counsel later clarified that the reference to La. R.S. § 22:658 was a scrivener's error and that the proper statute is La. R.S. § 22:657. (Rec. Docs. 33 & 35).

coverage was to insure the income that Dr. Pittman derives from the practice of urology.

Plaintiff argues that all of the medical evidence supports his contention that he is totally disabled. Plaintiff also adds that the Social Security Administration has declared him totally disabled under its more stringent test of being "totally disabled from any gainful employment." Thus, Plaintiff argues that he is entitled to receive total disability benefits for life.

In the event that the Court were to conclude that Dr. Pittman is merely residually disabled, then Plaintiff argues that the policy does not allow Paul Revere to use the depreciation expenses from Medical Center Diagnostics, an entity from whom he received no compensation, to offset his income from his urology practice. Plaintiff argues that the determination of monthly earnings under the policy deals with income earned from vocational activities and that his vocation was urology.

Plaintiff contends that Paul Revere's actions are a total repudiation of its obligations under the policy. Therefore, the doctrine of anticipatory breach applies and the Court should award Dr. Pittman a lump sum for past and future benefits.

Plaintiff argues that he should also be awarded penalties and attorney's fees because it is clear that more than 30 days

have passed since the time that Dr. Pittman provided sufficient proof of his disability to Paul Revere.  Plaintiff contends that Paul Revere did not adequately investigate his claim before deciding to terminate benefits.

In opposition, Paul Revere argues that the fact that Plaintiff engaged in only one occupation when he *applied* for coverage is not determinative because the policy clearly refers to "occupations" *at the time of* disability.  Paul Revere also argues that its treatment of Medical Center Diagnostics and of the deductible expenses attributable to that entity is consistent with the terms of the policy.

Paul Revere argues that Plaintiff cannot demonstrate the necessary elements of anticipatory breach under the facts of this case.  Paul Revere argues that anticipatory breach requires an actual repudiation of a contract by a party.  Paul Revere argues that the denial of a claim for benefits under an insurance policy does not constitute a repudiation of an insurance contract.  Paul Revere contends that it has not repudiated the contract of insurance but has merely abided by the policy language in denying the claim.

### The Parties' Arguments–Defendant

Paul Revere contends that its claim determination was both factually and contractually correct.  Paul Revere points out that

Dr. Pittman's own submissions demonstrate that he continued to perform some but not all of the "important duties" of a urologic surgeon through May 31, 2007.

Defendant argues that the policy clearly contemplates that an insured may be engaged in more than one occupation at the time that he becomes disabled. Paul Revere contends that it is undisputed that Dr. Pittman engaged in a second occupation as the Chief Executive Officer of Medical Center Diagnostics. Paul Revere relies heavily on the fact that Dr. Pittman claimed on his tax forms that he "materially participated" in the operation of Medical Center Diagnostics each year since 2002 and that this assertion is what allowed him to offset his own income by deducting losses for Medical Center Diagnostics. Paul Revere argues that Plaintiff and his staff are clearly trying to downplay his participation in Medical Center Diagnostics in order to help with this claim for benefits. Paul Revere contends that Plaintiff cannot have it both ways-either he materially participated in the business or he has been making a misrepresentation on his federal tax returns every year since 2002.

Paul Revere argues that its dealings with Dr. Pittman have been conducted in absolute good faith throughout the claim investigation and this litigation. Therefore, penalties are not

appropriate.

In opposition, Plaintiff argues that the policy does not define "important duties" and that it is undisputed that Plaintiff cannot perform surgeries and that he ultimately closed his medical practice as a result.  Plaintiff contends that Paul Revere has no basis to conclude that he was engaged in another occupation due to his activities with Medical Center Diagnostics. Regarding the tax returns, Plaintiff points out the deposition of his CPA shows that the CPA relied upon Dr. Pittman's participation in Medical Center Diagnostics in 2002 when claiming that the doctor materially participated in the business in subsequent years.

### *Law and Analysis*

The evidence of record persuades the Court that Dr. Pittman is owed total disability benefits under his policy with Paul Revere.  In <u>In re Katrina Canal Breaches Litigation</u>, the Fifth Circuit gave a comprehensive recitation of the law governing the interpretation of insurance policies in Louisiana:

> Under Louisiana law, "[a]n insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Louisiana Civil Code." <u>Cadwallader v. Allstate Ins. Co.</u>, 848 So.2d 577, 580 (La. 2003). The Louisiana Civil Code provides that "[i]nterpretation of a contract is the determination of the common intent of the parties." La. Civ.Code Ann. art. 2045 (1987); <u>see also</u> <u>Cadwallader</u>, 848 So. 2d at 580; <u>La. Ins. Guar. Assoc. v. Interstate Fire</u>

& Cas. Co., 630 So. 2d 759, 763 (La.1994). An insurance contract must be "construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any rider, endorsement, or application attached to or made a part of the policy." La. Rev. Stat. Ann. § 22:654 (2004). Interpretation of an insurance contract generally involves a question of law. Bonin v. Westport Ins. Corp., 930 So. 2d 906, 910 (La.2006) (citing Robinson v. Heard, 809 So. 2d 943, 945 (La. 2002)); see also La. Ins. Guar. Assoc., 630 So. 2d at 764.

"The words of a contract must be given their generally prevailing meaning." La. Civ. Code Ann. art. 2047 (1987); see also Cadwallader, 848 So. 2d at 580. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code Ann. art. 2046 (1987). "If the policy wording at issue is clear and unambiguously expresses the parties' intent, the insurance contract must be enforced as written." Cadwallader, 848 So.2d at 580.

Where, however, an insurance policy includes ambiguous provisions, the "[a]mbiguity . . . must be resolved by construing the policy as a whole; one policy provision is not to be construed separately at the expense of disregarding other policy provisions." La. Ins. Guar. Ass'n, 630 So. 2d at 763 (citing La. Civ. Code Ann. art. 2050 (1987) ("Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.")). "Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract." La. Civ. Code Ann. art. 2048 (1987). "A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective." Id. art. 2049 (1987).

Ambiguity may also be resolved through the use of the reasonable-expectations doctrine-i.e., "by ascertaining how a reasonable insurance policy purchaser would construe the clause at the time the insurance contract was entered." La. Ins. Guar. Ass'n, 630 So. 2d at 764 (quoting Breland v. Schilling, 550 So. 2d 609, 610-11 (La.1989)). "The court should construe the policy 'to fulfill the reasonable expectations of the parties in

12

light of the customs and usages of the industry.' " Id. (quoting Trinity Indus., Inc. v. Ins. Co. of N. Am., 916 F.2d 267, 269 (5th Cir. 1990)). "A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." La. Civ. Code Ann. art. 2053 (1987).

"If after applying the other general rules of construction an ambiguity remains, the ambiguous contractual provision is to be construed against the drafter, or, as originating in the insurance context, in favor of the insured." La. Ins. Guar. Ass'n, 630 So. 2d at 764. Article 2056 of the Louisiana Civil Code provides: "In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. A contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party." La. Civ.Code Ann. art. 2056 (1987). "Under this rule of strict construction, equivocal provisions seeking to narrow an insurer's obligation are strictly construed against the insurer." Cadwallader, 848 So. 2d at 580. "That strict construction principle applies only if the ambiguous policy provision is susceptible to two or more reasonable interpretations; for the rule of strict construction to apply, the insurance policy must be not only susceptible to two or more interpretations, but each of the alternative interpretations must be reasonable." Id. The fact that a term is not defined in the policy itself does not alone make that term ambiguous. Am. Deposit Ins. Co. v. Myles, 783 So. 2d 1282, 1287 (La. 2001).

"An insurance contract, however, should not be interpreted in an unreasonable or strained manner under the guise of contractual interpretation to enlarge or restrict its provisions beyond what is reasonably contemplated by unambiguous terms or achieve an absurd conclusion." Cadwallader, 848 So. 2d at 580. "Courts lack the authority to alter the terms of insurance contracts under the guise of contractual interpretation when the policy's provisions are couched in unambiguous terms." Id.

In re Katrina Canal Breaches Litigation, 495 F.3d 191, 206-08

13

(5th Cir. 2007).

Pursuant to Paul Revere's policy, "Total Disability" means that because of an Injury or Sickness:

> a.    You are unable to perform the important duties of Your Occupation; and
>
> b.    You are receiving a Physician's Care.  We will waive this requirement if We receive written proof acceptable to Us that further Physician's Care would be of no benefit to you.[2]

(Pla. Exh. A, Policy w/ App.).

The policy defines "Your Occupation" as "the occupation **or occupations** in which You are regularly engaged at the time Disability begins."  (Id. (emphasis added)).

It is undisputed that Dr. Pittman sustained a back injury that causes chronic pain so severe that he can no longer perform surgery.  The medical evidence is consistent and uncontradicted on this point and comports with Dr. Pittman's own assertions. Paul Revere conducted video surveillance of Dr. Pittman just prior to cancelling his benefits but the report reveals nothing inconsistent with Dr. Pittman's assertions or with the findings of the doctors who have examined and treated him.

------

[2] Satisfaction of requirement (b) has not been made an issue in the case.  Nevertheless, the record suggests that Plaintiff has continued under the care of Dr. Shamsnia.  Further, Dr. Doty did not seem to believe that ongoing medical care would be of much benefit to Plaintiff.  (Pla. Exh. H).

It is beyond cavil that the ability to perform surgery is an "important duty" of being a urologic surgeon.  The record demonstrates that surgeries comprised a significant part of Dr. Pittman's practice.  Nevertheless, Paul Revere terminated Plaintiff's total disability benefits because he "continued to perform some of the occupational duties of a Urologic Surgeon, notably seeing patients, performing consultations, ordering laboratory tests, and administering medications," and Paul Revere believed that these activities were also some of the "important duties" of a urologic surgeon.  (Pla. Exh D, 4/30/07 Stimson ltr).

The record demonstrates that in the immediate aftermath of his injury Dr. Pittman did continue to engage in some aspects of his medical practice that were not foreclosed by his chronic pain.  This is not particularly surprising given that Dr. Pittman had enjoyed a thriving practice up until the time of his injury.[3] Nevertheless, it seems rather nonintuitive and arbitrary to rank tasks such as seeing patients, performing consultations, ordering laboratory tests, and administering medications--tasks that while necessary are clearly incidental to any surgeon's practice--in importance with the ability to perform surgery on the male

---

[3] Dr. Pittman's practice had been diminished somewhat in the aftermath of Hurricane Katrina.  (Pla. Exh. J. at 5).

genitalia.  Dr. Pittman was a urologic surgeon—not a nurse
practitioner.  Total Disability under the policy does not require
that the insured be unable to perform *all* of the duties of his
occupation and coverage is not precluded merely because Dr.
Pittman could perform some of the occupational duties that any
medical practitioner might perform as part of his practice.
Rather, under the clear terms of the policy coverage is triggered
when the insured cannot perform the "important duties" of his
occupation.  It is clear that Dr. Pittman cannot perform the
important duties specific to a urologic surgeon because he cannot
operate on patients.  In fact, Dr. Pittman ultimately closed his
urology practice completely, an act that he attributes to his
inability to perform surgery, and he has not practiced urology or
any form of medicine since that date.

Paul Revere also denied total disability benefits based on
its conclusion that Dr. Pittman was engaged in an additional
occupation in his capacity as owner of Medical Center
Diagnostics, and that he continued to perform the duties of that
"occupation" even after his injury.  Pretermitting consideration
of the policy application, the policy itself clearly contemplates
that the insured might have more than one occupation at the onset
of disability.  (Pla. Exh. A, Pol. Defn. 1.9; see policy text
quoted <u>supra</u>).  Thus, if Dr. Pittman had a second occupation as

owner of Medical Center Diagnostics, then reading the definitions of "Total Disability" and "Your Occupation" together, Total Disability benefits would not be payable unless Dr. Pittman was *unable* to perform the important duties of a urologic surgeon as well as the important duties of the owner of Medical Center Diagnostics.

The Court is not persuaded that Dr. Pittman's involvement in Medical Center Diagnostics precludes Total Disability coverage because the record does not support Paul Revere's conclusion that Dr. Pittman's duties as owner of that business constituted an occupation at the onset of disability. Paul Revere concluded that Dr. Pittman had a second occupation based largely upon the information gathered during Charles McGinty's June 7, 2006, field visit to Dr. Pittman's home. (Pla. Exh. D). The report from that visit indicates that Dr. Pittman attends a business meeting at Medical Center Diagnostics once per week for about an hour and that in the aftermath of his disability he focused much more on his various business ventures, including conducting a lot of business on the phone. (Pla. Exh. J at 6). Using this sparse information and the fact that Dr. Pittman's Form 1040-Schedule C indicates that he "materially participated" in the operation of

Medical Center Diagnostics,[4] Paul Revere concluded that Dr.
Pittman was engaged in a second occupation by performing the
duties associated with being the owner of that business.

After the Court had the opportunity to review the record in
its entirety, including the evidence gathered during the course
of this litigation and therefore *after* the claim had already been
denied, it struck the Court as odd that one would characterize
Dr. Pittman's activities with Medical Center Diagnostics as an
"occupation" as that term is used in common parlance. This is
true particularly when one considers that the overwhelming
majority of Dr. Pittman's time prior to his injury was devoted to
his medical practice and that he received no income from Medical
Center Diagnostics.

The policy does not define the term "occupation," a
circumstance that does not in and of itself render the policy
ambiguous. Webster's Dictionary defines "occupation" as the
*principal* business of one's life, a craft, trade, profession or
other means of earning a living. Webster's Third New
International Dictionary 1560 (1971). Black's Law Dictionary
defines it as an activity or pursuit in which a person is

---

[4] The assertion regarding material participation is
significant for tax purposes because it allows the filer to
deduct business losses from a business venture against personal
income.

engaged, especially a person's *usual or principal* work or business. 1109 (8th ed. 2004). Applying these definitions, which constitute the ordinary usage of a term not otherwise defined by the policy, Dr. Pittman's activities on behalf of Medical Center Diagnostics did not constitute a second occupation at the time his disability began. Dr. Pittman's principal business was that of a urologic surgeon. Medical Center Diagnostics was a business venture from which Dr. Pittman derived no income and from which he benefitted mostly for tax purposes. Medical Center Diagnostics performed no urologic services but rather was an imaging center performing MRIs, mammograms, etc. Dr. Pittman is not a radiologist and he performed no vocational services for that business whatsoever. Dr. Pittman clearly performed certain tasks for the business that were commensurate with the fact that he owned 100 percent of the business but there is no evidence that he was involved with the day to day operations of the business. He attended a short meeting one day a week and talked on the phone quite a bit. Using the generally prevailing meaning of the term "occupation" would not lead one to conclude that Dr. Pittman's pre-disability involvement with Medical Center Diagnostics constituted a second "occupation."

Further, the application for insurance that Dr. Pittman completed in 1994 is part of the policy. (Pla. Exh. A at 1).

The application states Dr. Pittman's occupation as that of a urologist and it is patently clear from the information that Dr. Pittman provided on the form that the purpose of this policy was to insure against the very thing that in fact happened, i.e., that Dr. Pittman would be forced to give up his lucrative medical practice due to an injury. Dr. Pittman paid his premiums faithfully through the years believing that he was protected only to find out that under Paul Revere's interpretation of the policy his insurance was uncollectible based on an investment that he had made in a completely unrelated medical business.[5]

In support of its position regarding a second occupation, Paul Revere has placed great emphasis on the fact that the Form 1040-Schedule C filed with Dr. Pittman's federal tax return indicates that he "materially participated" in the operation of Medical Center Diagnostics. IRS regulations dictate the minimum levels of participation in a business that would allow an individual tax payer to reap the tax benefits of a Schedule C business. In light of these regulations, Paul Revere argues that Dr. Pittman's claims in this case regarding his minimal participation in Medical Center Diagnostics are inconsistent with

---

[5] The insurance was uncollectible because Paul Revere concluded that even under the Residual Disability section of the policy Dr. Pittman would be entitled to nothing in light of his ownership in Medical Center Diagnostics.

the assertions made to the IRS.  Paul Revere argues that Dr. Pittman cannot have it both ways and that he either misrepresented his participation to the IRS or he is misrepresenting now in order to receive benefits.

Dr. Pittman's tax forms were prepared by his CPA who stated in his deposition that he checked the "material participation" box in reliance upon his understanding of what Dr. Pittman's participation had been when he incorporated the business in 2002. (Def. Exh. 32).  The CPA had no firsthand knowledge regarding Dr. Pittman's actvities.

Paul Revere's obligations to its insured are governed by the terms of its policy.  Paul Revere cannot avoid its obligations based on assertions made to the IRS, when the facts as presented demonstrate that coverage applies, anymore than Plaintiff can require Paul Revere to pay benefits based solely on the Social Security Administration's finding that he is totally disabled. Both are factors to be considered in light of all the evidence but the policy still controls.  The facts of this case, when viewed through the lens of the policy itself, simply do not support the conclusion that Dr. Pittman was engaged in a second occupation.

Finally, Plaintiff contends that Paul Revere's actions are a total repudiation of its obligations under the policy.

Therefore, the doctrine of anticipatory breach applies and the Court should award Dr. Pittman a lump sum for past and future benefits.

Anticipatory breach of contract "applies when an obligor announces he will not perform an obligation which is due sometime in the future. The obligee need not wait until the obligor fails to perform for the contract to be considered in breach." <u>Fertel v. Brooks</u>, 832 So. 2d 297, 305 (La. App. 4th Cir. 2002) (quoting <u>Gulf Coast Bank & Trust Co. v. Rick Granger Enters.</u>, 800 So. 2d 402, 404 (2001)).

The Court agrees with Paul Revere's assertion that Paul Revere's denial of Plaintiff's claim for benefits does not constitute a total repudiation of the policy. Moreover, the policy pays disability coverage so long a the insured cannot perform the important duties of his occupation. Although the medical evidence of record indicates that it is highly unlikely that Dr. Pittman's back problems would resolve in the future, the possibility nonetheless remains. Plaintiff cannot demonstrate the necessary elements of anticipatory breach.

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Motion for Summary Judgment (Rec. Doc. 75)** filed by defendant The Paul Revere Life Insurance Co. is **DENIED**;

**IT IS FURTHER ORDERED** that the **Motion for Summary Judgment (Rec. Doc. 74)** filed by plaintiff Michael Norman Pittman, M.D. is **GRANTED IN PART AND DENIED IN PART**. The motion is **GRANTED** insofar as the Court finds that Plaintiff is Totally Disabled within the meaning of the policy and that he is entitled to all benefits due under the Total Disability and Lifetime Total Disability Rider, including past due benefits, and the refund of premiums paid after the onset of disability. The motion is **DENIED** insofar as Plaintiff seeks a lump sum under the theory of anticipatory breach of contract;

**IT IS FURTHER ORDERED** that the parties shall submit supplemental memoranda pertaining solely to whether Plaintiff is entitled to an award of attorney's fees and penalties, said memoranda to be filed no later than **ten (10) days** from entry of this Order and Reasons;

**IT IS FURTHER ORDERED** that the **Motion to Amend/Correct Petition (Rec. Doc. 78)**, in which Plaintiff seeks to add a jury demand pertaining to the anticipatory breach of contract claim, is **DENIED** as moot.

January 15, 2009

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE